Haynes, J.
(orally).
The petition for cause of action sets up certain matters in regard to a proposed electric street railroad that it is the intention of certain of the defendants to build in Huron street, —matters which are set up by the proper averments, and the fact that Mrs. Simmons is the owner of property upon that street, and raises four questions, which are stated in the brief of counsel for plaintiff:
First — The requisite consent in writing of the owners of the lots and lands abutting upon that part of Huron street over which this road is proposed to be constructed as represented by the feet front, was not obtained or produced to the .common council.
Second — The application for leave to construct this-road was not advertised, as required by the general ordinance of the City of Toledo governing this matter.
Third — The City of Toledo has no power to-authorize the erection of poles and wires and the building of other structures and appliances for the purpose of transmitting power over naked, uninsolated wires for the purpose of propelling street cars.
Fourth — The construction and operation of the necessary appliances-and apparatus, and the use to which the same are put in the operation of an electric street railway, materially injures and interferes with the property upon the line of the street, and constitutes an additional burden, for which compensation must be made before such apparatus and appliances can be constructed.
*537 Counsel for plaintiff have argued their case in the order in which these propositions are stated, and in delivering the opinion, we will endeavor to follow the same order.
The statutes of the state to which these propositions refer are, first:
See. 3439. No such grant shall be made until there is produced to council, or the commissioners, as the case may be, the written consent of the owners of more than one-half of the feet front of the lots and lands abutting on the street or public way along which it is proposed to construct such railway or extension thereof * * *.
Sec. 2502 * * * and no such grant shall be made except to the corporation, individual or individuals, that will agree to carry passengers upon such proposed railroad at the lowest rate of fare, and that shall have previously obtained the written consent of a majority of the property holders on the line of the proposed street railroad, represented by the feet front of lots abutting on the street along which such road is proposed to be constructed. * * *
And the plaintiff states, as a construction of that statute— or, as it is claimed, the manner in which the statute shall be construed :
“1. That the consent of the owner is required; not the consent of any other person, however wise, learned or influential.
“ The consent of the owners as represented by the feet front. In other words, the owners act in this matter in proportion to their interests in the real property as measured by its-frontage, and not by their number or character in any other respect.
“ 3. This consent must be in writing. No oral consents, however formal, can take the place of the plain statutory requirement that these consents must be in writing.
"4. These consents must be obtained and produced to the common council as a condition precedent to the power of the council to act.”
Now, in regard to these propositions, J will state generally the conclusions to which we have arrived.
As to the first proposition : “ The consent of the owner is *538 required; not the consent of any other person, however wise, learned or influential.” We agree, in the main, with the statement that is made by counsel in that respect. Where we may differ from him, is upon the evidence of the consent. We agree that the statute contemplates that it is the owners of the lands themselves» whose consent is to be given, whose opinion is asked for and required, under the statute, by the common council.
. “ 2. The consent of the owner as represented by the feet front. In other words, the owners act in this matter in proportion to their interests in the real property as measured by its frontage, and not by their number or character in any other respect.”
To that we agree, with the exception,, perhaps, that the last clause might have reference to tenants in common of the property, and in respect to that I will speak hereafter.
“ 3. This consent must be in writing. No oral consents, however formal, can take the place of the plain statutory requirement that these consents must be in writing.”
That the consents must be in writing, there is no question, because the statute requires that.“no oral consents, however formal, should be taken ;” that is substantially true, and by that I mean that the statute does not contemplate or authorize the council to receive the consent of an owner, even though he. should be present, stating his consent orally; it contemplates written consents, placed on file, open to the examination of all parties who are interested in the matter.
“ 4. These consents must be obtained and produced to the common council as a condition precedent to the power of the council to act.”
I think on that question there is no dispute; if I understand it properly.
' The next question that plaintiff makes is in regard to the .ownership.
“ The words ‘ owners and holders % as used in the two sections, are obviously synonymous terms. Precisely *539 as we would use the words ‘ owners of stock ’ and ‘ stockholders’ to convey the same idea, so here these two parts of the same statute use these two words to convey the same idea; and in one section of the statutes of Ohio the two words are used interchangeably.”
I do not think there is anything that arises, under the view of the facts of the case as we finally find them to be, which would require any extended definition in regard to this matter. The statute treats and speaks of the owners of property. There was a question that did arise, I believe, in one case, in regard to the rights of a tenant for life, but I think, under the decision that wé make, it will be unnecessary to discuss that, and in regard to that, I will speak as I pass over the names.
The material and main thing, and perhaps one of the most difficult questions of the ease, is this claim made on behalf of plaintiff:
“That the consent must be in writing. Upon this question the statute is clear, express and explicit, and until this case, it has never been questioned. In every discussion arising under such statute, it has always been assumed that the consent, for whatever purpose it is desired, must be in writing, and it would certainly be a remarkable state of affairs if the power of the council to act in-these important matters should depend upon parol proof as to what happened on street corners, or that the signature of A. should be controverted, by parol proof, into the written signature of B.”
There are different classes of cases upon which this question arises. Some of these consents are consents by the owners of the property. Some are consents in the names of the owners of the property by persons purporting to be acting as their agents. In other cases they are signed by the husband, the wife being the owner of the property, and the parties have put in parol proof showing that the wife gave her consent to the signature, and it is required of the court to count the name of the husband as re *540 ally the name of the wife, or, at least, to count it as a legitimate consent, under the statute, of the property owner to the work It is said in thát connection that the consent is a vote, and that the signature, as we understand the argument of counsel, that is attached to those consents, should be signed by the owner himself or herself; in other words, that it should be the personal matter of the party who gives the consent,and that the only evidence that could be before the council would be that the signature which was attached-to. the consent should be in the hand-writing of the person who gives the consent. This matter is discussed, and some citations given upon the question. . .
At first blush it would seem, and at least it may be very properly and very strongly claimed, that when the statute requires that the consent shall be in writing, it means that it should be, and that council should have the written evidence of the party who owns the land;»the highest and best evidence — the real evidence in the case, so far as the writing is concerned, would be the signature of the party himself. On that point counsel based a very strong argument in favor of their proposition that all consents should be excluded .except those signed by the owners of the property. We are unable to concur with counsel in that respect. We agree with them that the consent should be signed by the owner of.the property ; but the manner in which that should be evidenced, and the method of evidencing it — even of that written document— is one upon which we have come to a rather different conclusion from the one suggested by counsel for plaintiff. Reference is made to the statute of frauds, and an analogy is sought to be drawn from that. The statute of frauds provides that when any grant is made of real estate or an interest in it, it shall be signed by the party who is to be charged, or by his agent thereunto lawfully authorized. And, in regard to land contracts, it provides that the papers shall be signed by the party to be charged, or his agent thereto lawfully authorized ; and in one case, it is held, rightfully, that the au *541 thority of the agent must be given in writing. The consent itself may be by power of attorney, under the statute, and when it conveys an interest in land, it is necessary not only that the authority should be in writing, but that it should be acknowledged. In regard to contracts, it is agreed on all hands that no written authority is necessary in or to give the agent authority to sign the name of his principal to a paper. The ordinary commercial rule is that a person may do by the hand of another that which he may do himself. It is said, however, that that rule should not be applied in this case; that it is not intended to be so applied. That, while that is true as to commercial law, it is not true in a just and fair construction of this statute. We think it must be admitted, however, if a man, being unable to write his name, should, in the presence of a person who should write his name, direct him to write that name — request him to write it — it would be held by law to be his act — be held to be his written document. Indeed, it is quite common in commercial transactions, that a person should make his mark, which is done by simply taking hold of the pen ; and so it is to be supposed if a man couldn’t write, if in the signing of this paper he should request a party to write his name, and the person touched his hand to the pen in making the cross, it would be his signature, and we think it is, also, if he should request a party standing by to sign his name, that that would be his signature.
We have had cited to us the case of Rapp v. R. R., decided by Judge Longworth, in the Superior Court of Cincinnati, and citing a New York case. We have read that case with a great deal of care and attention and interest in his reasoning. He refers to the statute of frauds, but refers to the statutes under which he was then deciding the case that he did decide. That was a suit a little different from this; but it is stated that the consents are required to be in writing, and he argued from the statute of frauds that if the legislature, in that particular act, had sought or desired to change the law of the statute of *542 frauds, or if they had desired to state that the party might sign his own name, or to have signed his name by an agent, that they would so have stated in the statute itself. It seems to us that the very reverse is the conclusion to be drawn. In regard to the statute of frauds, the legislature were particular to say that the party who was to be charged must sign the paper himself — “ signed by the party whose name is to be charged,” is the language. If they had desired that the consents in writing should be signed by the individual who owned the land, it would have been easy for them to have said that the consents should be in writing, and be signed by the party who owned the land. We see nothing in the construction of the statute itself, we see nothing in the nature of the business that is being done — the obtaining of the consents — that should require a strict construction of this statute. No grant is made of any interest in the land itself — I believe we all agree about that; it is in only a matter of so much importance as a street railroad along a public street, one that affects the interests of the property owners, or affects their taste at any rate, and the law provides that before the council shall be permitted to grant that right of the public in the street to a railroad company, the landholders shall be consulted, and that they shall give their consent; and it is provided and held, perhaps, that the council should not act and cannot act until those signatures or consents are obtained, and that those consents give jurisdiction to the acts of the council. But the thing that is sought to be obtained all the time, is the consent of the owner, and to know that he is willing that the railroad company shall pass with their road. It requires that consent shall be made in writing, or at least be made a matter of record, to be filed in the office of the city council, so as to be open to the inspection of the public, and so as to be definite and certain as to the respective rights of the parties. Suppose now that the paper is signed and presented to the council with, the consents, and the person making the application to the council says: “We have obtained the consent of the *543 requisite number of the 'property owners upon the street, and we ask the council to pass the ordinance and he lays the paper down. The council look at the paper and say: “We don’t know the signatures upon that paper; how do we know who are the property owners ?” He then. presents his abstract of title, and furnishes evidence that the party has signed —that the signature purporting to be his true and genuine signature is such. In that instance the corporation has to go .by parol evidence; it is the very first step of showing that the ^property owner has consented, and when it is shown that that is his signature, then, of course, it is his consent in writing evidenced by the best of evidence, to-wit, his own signature.
Suppose we come to the next thing, and say that this purports to be signed b.y the land-owner by A. B., his agent. How do we know that that is his agent ? Two things are to be proved ; one is that A. B. is his agent and authorized to sign that paper for him ; and secondly, that he has signed it by the agent. They then have the Consent of the owner, and have it in writing; have it supported, as in the first instance, by parol evidence; but is not that still the written evidence of consent of the party ? If a man presents a paper in court, if it is shown that he signed that paper by his duly authorized agent, is not that, in law, his contract in writing?
We see no reason why we should not hold that when the contract is signed in the name of the principal by the agent thereunto duly authorized by the owner of the property for that business, that the council have before them the written evidence of the consent of the owner — his written consent in law. Following that, we have, as a general rule I will say, taken the names that purport to be signed by the agent — either signed in the form “A. B. by C. D., his agent,” or “C. D. by A. B.”, and where evidence has been given that the owner of the land had authorized the party to sign his name for the street railway, we have allowed that signature to stand .and be counted as a signature for the road.
*544 We have then the fact that the owner's attention has been called to .the road; we have the fact that the owner has decided in favor of the road passing through Huron street; we have the authority of the agent, and we have the signature of the owner by the agent-presented to the council and acted upon by the council.
Now, in regard to those claims about which there is contention ; that is, where the signature has been made in the name of a party who does not purport to sign for the principal — say in the name of the husband. We have, as a general rule, excluded those, because nowhere does it purport to be the signature or written consent of the owner of the property, and turn it whichever way you will, prove it by whatever way you may bring it in, you still have simply oral evidence that the party has given his consent, and nowhere would the fact be raised, in fact or in law, of his or her written consent to the railroad being built.
In Regard to the owners of the property, there is a considerable class of cases to which objection was made — where they were tenants in common. It seems to us that, as a matter of right, a person who is a tenant in common would have a right if he votes in favor of the railroad, to have that vote counted. He is the owner of a certain definite interest in the property. You take the case of Judge Lemmon, who owns, in conjunction with two other parties,- a lot of land on Huron street. He owns an undivided one-third of every foot of that property, and as much upon the street front as upon the back. It may be said that he might be awarded his property at the rear end of the lot; but then, also, he might be awarded the property at the front end ; the real fact is that he has a definite interest in the property — a one-third interest in the property. Every person who does not sign that paper or vote for it, is counted against it. He is anxious to have the road built. You say to him that because other parties don't vote for it, his vote shall not be counted, and he is practically disfranchised and excluded from his interest in the property. We *545 think, as a matter of law and right, his opinion should be counted, and we think the Supreme Court in 35 Ohio St., p. 455, has precisely decided that it may.
There are some other matters in connection with this that may be raised as I go' through the list of names. There is a matter in connection with questions argued by the counsel, and that is — where the burden of proof lies in regard to these matters.
It seems to us — and we have been very clear upon that all the way through — the Supreme Court say that a property owner may contest the question whether or not the council has the requisite number of consents before it to give the council a right to pass upon it- — we think the burden of proof in a case of-this kind lies upon the plaintiff to show that the consent was not given; that it to say, the presumption of law is in favor of the action of the city council; that is the general rule of law. It is the rule of law in our judgment applicable to this case. When a name is reached, upon the list, the council pass upon it. What evidence is given by the plaintiff to show that this party did not give his consent?
A good deal of testimony has been offered where the question has been about whether they gave their consent in writing. The question was properly put, because counsel wished to raise a certain question, and we think that was the proper way to raise it. They pursue their case upon the theory that the consent must be in writing, and seemed to be willing to abide by the proposition of law in this respect; but in following out the inquiry upon these names, we have gone upon the assumption that the burden of proof is upon the plaintiff to show that the signature of the party attacked is not the signature of the party that it purports to be. We have read the abstract over, and there is a large number of cases where the signature does not purport to be the signature either made by the owner himself, or by his agent. In that class of cases, it is sufficient to show that the party did not own the land.
*546 Touching this first question. The abstract that was furnished by counsel for plaintiff shows, first, that there is, by the agreement of the parties, a consent of 3,176.83^ feet that is undisputed. The agreed statement is that the whole frontage upon the street is 10,605 feet (and a fraction, I think). Taking the 3,176 feet as admitted as a standard, we come first upon the statement of persons who have remonstrated and practically taken their names off prior to the 18th day of March. We have stood by the 18th of March, and have examined all these names, and gone over them.
It is objected that parties had not the right to take their names from the paper after they had once signed. We think,, under the decision of the Supreme Court, that that is a matter of right — that a party would have the right to withdraw his name before the council had acted upoh the paper and passed the ordinance. The date is fixed before it was passed by the first one, and we will allow it to stand at that point.
Now, coming to the list of names that the counsel on behalf of plaintiff object to being counted. We have gone over these names, one member of the court taking the abstract and the other following the evidence, with such notations as appear, and taken them up one by one.
The first signature is that of George Willard. In this case Willard signed the paper — a consent. He afterwards withdrew that consent; and afterwards a paper was submitted to the council, it is said, in these words : “ Ironton, O., March 25, 1889. I do not wish to stand in opposition to any enterprise o'f general good to your city. I think it best to withdraw my name from the Electric Ry. remonstrance. George Willard.” The council acted upon the name of George Willard — have acted upon the paper before them, and they have counted his name. It was one of the names as in favor of the road. We think, under the rule we have laid down, the burden of proof is upon the plaintiff to show that Mr. Willard did not give the consent; that he did not sign the telegram, if you please, that was sent upon which they acted. We think *547 counsel for defendant might well have omitted any testimony whatever of the character that they did attempt to offer-through Mr. Clark, in support of the telegram. We have-therefore allowed the name to stand. So far as the objections to the testimony of Mr. Clark are concerned, these objections may be sustained — so far, at least, as the telegram is concerned.
There is another thing in regard to that (and that pertains to quite a number of the signatures), which I will dispose of as I pass. The consent was given upon this condition: “Work to be commenced upon said railway, completed and in full operation within one year from the above date ; or to become void and of no effect.” We think those conditions are in the nature of conditions subsequent, and that their effect lies as between the party who signed the paper and the party who builds the road. If the party building the road does not comply and conform to those provisions, the party who has given the consent with those conditions, if he has any claim or right against him in regard to the matter which he can enforce, he has a right to enforce it as between himself and the parties building the road ; but so far as the city council is concerned, we think that should not preclude the city council from acting upon it as a consent that the road should be built, and count it as one of the consents; and hence, in regard to these names which are signed under such conditions, we have held them, as.a general thing, to be counted.
Mr. Pratt — On the 18th of March his remonstrance with drew that consent, and the telegram is dated the 25 th of March. The first body had no jurisdiction.
The Court — We have discussed that' matter; that was filed before the ordinance was finally passed.
Mr. Pratt — It passed the first board on the 19th ; this telegram was on. the 25th, and the ordinance was finally passed on the 27th; but at the time the first body passed it, it didn’t have his vote in favor of it.
The Court — That is so, but at the time of the passage of the *548 final ordinance, before the final body, it was before the council. We took the remonstrance as of March 18th. In regard to the effect of the consents and their effect upon the validity of the ordinance itself, we have-treated the ordinance the same as we would the passage of a law by the general assembly— as taking effect and to be considered as of the date -when it passes the last body, which first gives it validity; and in discussing this question we counted it, because the telegram was received and aeted upon by the council before it was finally passed, and the effect of that was to withdraw the remonstrance, and leave the original consent as a consent subsequent before the council.
In the case of the signature of John C. Carland, ownership in Rose Carland, lot 39, Johnson’s addition, 34.50 feet, that is signed in the name of John C. Carland ; the ownership being in Rose Carland, that, under the rule which I have stated, is not received — that was rejected.
The signature of William Bell, (No. 3 on this paper “Memorandum of Evidence upon-the Question of Consents”). Willima Bell, for wife. Ownership Hannah M. Bell, 53.93 feet. Hannah M. Bell saw her husband, William Bell, write on this consent; she didn’t know what he wrote; gave him no instructions or directions to write her name. She identifies the name “ Wm. Bell” as the handwriting of her husband, but does not recognize the words “ for wife,” and they are obviously in a different handwriting from that of the signature “ Wm. Bell.” Mrs. Bell told her husband with reference to this matter, “ Do as you please.” The signature is the signature of William Bell, and was signed in the presence of Hannah Bell, and he was consenting, and she was consenting also, to the building of the road, and for that reason, upon the examination of the testimony of Hannah M. Bell herself, we have allowed that to stand as a consent in favor.
The signature of R. Law (No. 4). Theownership was in Elvira Law. “ Robert Law had told his wife, that he was going to sign for the electric street railroad; he had never told her *549 that he was going to sign her name, or for her. She is rather inclined to think that she don’t know whether she wants the road or not.” This is the testimony of Law, and is correctly stated in substance. That we reject. The consent of Mrs. Law was never had, clearly stated.
The signature of F. B. Dodge. The ownership was in Caroline P. Dodge as to 84 feet. That is the signature of F. B. Dodge, and of himself alone. She raised no objection,'but there is nothing to show, no evidence, that she ever in any manner or form authorized him to sign for the 84 feet, and as he is the owner of a large amount of property on the street, it does not appear with sufficient distinctness that she understood that he had signed for her property. And again, he does not sign in her name, or as her agent, and we therefore reject the 84 feet.
No. 6 is the signature of John Schminck. The ownership was in his wife, Benadena Schminck. “ After Schminck had signed his own name to the consent, he told his wife that he had done so. She never objected to his signing his own name to petition.” The testimony here is substantially the same as in the case of F. B. Dodge, and that is rejected. The signature is simply John Schminck.
No. 7 is the signature of Mrs. A. Susor. The ownership was in Joseph Schindler, trustee. “ Prior to February 7th, Mrs. Anna Susor was the owner of the property. In her absence, and without her authority, Elias Susor signed her name to the consent. February 7th, the property was conveyed to Joseph Schindler in trust for Elias Susor. No further attempt to give consent was made.” The testimony shows that Mr. Brumback was present at the time the signature was obtained. The signature was made by Elias Susor. He first signed it “ E. Susor,” and the question being raised whether the title of the property was in himself or his wife, the signature was changéd to “ Mrs. E. Susor.” The property was afterwards conveyed by her to Joseph Schindler in trust for Elias Sutor, so that he himself had a beneficial interest in the *550 property before the consents were passed upon by the council, and never made any objection. We think, under the peculiar circumstances of these facts, he having a beneficial interest, he signed his own name and then attempted to sign hers — that the evidence of his consent was fairly before the council, and we have therefore allowed this to be counted.
No. 8 is the signature of William Doty for Alice Doty. The ownership was in Alzorah Doty, his wife. She authorized him to sign, and that is allowed.
No. 9 is the signature of H. Hood for M. C. Hood. The ownership was in Mary C. Hood. They had talked the matter over, and agreed that the consent should be given. That is therefore allowed.
No. 10 is the signature of F. B. Shoemaker. A. C. H. Royce by F. B, Shoemaker. The ownership was in Mrs. Alice C. Royce. The signature was rejected as a consent.
No. 12 is the signature of Chas. P. Barnum. The ownership was in Adaline L. Barnum. . This was signed at the court house. There had been a general conversation between him and his wife, but there was no sufficient authority given him by his wife to sign, and this was a signature the council had no right to pass upon ; and therefore we reject it.
The 12th signature is Mrs. Nicholar Hayes. The memorandum is: “ There is no evidence that Mrs. Nicholas Hayes had any interest in the property.” The property, it seems, had belonged to Nicholas Hayes. The abstract shows that he was dead. There is no evidence to show on the part of the plaintiff but what Mrs. Hayes was the legal and lawful heir of Nicholas Hayes, as she might very well be under the statute, or under a will, and in a case of that kind, where the council passed upon it, we think the burden of proof is upon the plaintiff to show that Mrs. Hayes did not possess the-qualifications to consent, and therefore have allowed it.
No. 18 is the signature of A. M. White, by Coghlin, agent. *551 In that case we allow it. We think the evidence shows that Mr. Coghlin had sufficient authority to sign. In that case the judgment was left in Mr. Coghlin. We are of the opinion that where the matter of the building of this road was brought before the owner of the land, he having an agent upon the ground, and says to him : “ I have been requested to sign a consent upon that railroad; I send you the letter, and request you to act for me and use your best judgment in the matter,” we think that that judgment should bind the principal, and therefore we have allowed the signature.
The next is No. 14, the signature of Charles Butler by R. & E. T. Waite. We have allowed that to be counted. ,, We think that should be counted; they were authorized in writing, and exercised their agency.
Alvah S. Hobart, per letter. The ownership is in him. We have allowed that.
'No. 16. C. M. Bellman is the next signature. The ownership is in Charlotte M. Bellman.ti: We think the testimony shows that he had authority. That purports to be the- signature of the owner of the land. The council passed upon it. There was some testimony that one of the persons who got the signature, went to the house to see her, and that she said he might sign, and he went to the telephone and called up somebody, and then signed it. The council having passed upon the consent, we think that the burden of proof is on the other side-to show that she did not sign.
No. 18. D. Lovett by D. L. In this case we think the authority given was sufficient; she told her husband that he might sign the consent. A fortunate thing about that was— that her name was Delia and his name was Daniel; and you may turn it whichever end you will, and it comes out all right. I don’t know whether it is intended to be Daniel Lovett, by Delia Lovett, or Delia Lovett, by Daniel Lovett; but that is for the plaintiff to establish.
No. 18 is the signature of “Mary C. Milliard, per I. I. Milliard,” and is counted.
*552 Samuel S. Southard, per E. B. Southard. (No. 19.) In this case Samuel Southard told his son he might sign for him if he thought it was best, and he exercised his judgrhentand signed it, and it was counted.
The next (No. 20) is Mary Jane Pixley, by C. A. Pixley. That we count on the testimony of Charles Pixley.
No. 21. Jane Dooley, by F. W. Rickenbaugh, Agent. That we reject for want of sufficient authority, it appearing that all the evidence is before us in the case.
Mary R. Bullock, per B. E. B., Atty., (No. 22.) In that ease we allow, there being evidence that the husband was authorized to sign for her.
The next signature is No. 23. Connecticut Mutual Life Insurance Company, by W. Baker. That we have rejected, on the ground that'Mr. Baker does not show sufficient authority for that particular purposé, although he has very large authority from the Connecticut Mutual.
No. 24. F. D. Barnés, by T. B. Lee, Agent. We reject that also, as not having sufficient authority, all the evidence being before us.
No. 25. The signature of Mrs. C. M. Hayden, per C. M. H. We admit that on the testimony of Mr. Hayden, as having sufficient authority.
No. 26. E. M. Coghlin is the next signature. We admit that for the same reason.
No. 27. Mary E. Lee, by Ira E. Lee. We admit that for the same reason.
We allow the signature of Almira Pixley, upon the testimony. of Mr. Pixley.
No. 29. H. E. Schenck by S. C. Schenck. That is also allowed.
No. 30. Fanny L. Forbes by O. A. Forbes. It appears in this case that the wife never fairly consented; she don’t know whether she did or not. We reject that, because it is not clear that she consented.
F. W. Bainbridge, E. A. Bainbridge, authorized by F. W. *553 B. That we allow upon the testimony of F. W. Bainbridge.
No. 32. D. Sullivan by L. S. Sullivan. This property seems to have belonged originally to D. Sullivan. It was in the possession of L. S. Sullivan. I think he says he signed four times, in some form or other; he was determined that the city council should know that he was consenting to the construction of this road. He signed one signature on the 15th of March, and another on the 23rd. We have counted him as consenting.
No'. 33. Doan Blinn for E. Louise Blinn. We reject this upon the testimony of Mr. Blinn; there does not seem to be any definite knowledge as to whether his wife consented^ -
No. 34. William .Rawle — West estate. This we reject. There is no evidence that Mr. Rawle had authority to sign for the West estate. THe ownership seems to have been in Clara G. Kelley, Lewis F. West and Frank E. West, and he don’t profess to sign their names in the signatures of the owners of the property, which are not placed in the petition at all. We reject that for the reasons we have already stated.
No. 35. William Rawle, Agent P. Laughlin. That purports to have been signed by Rawle as agent for Patrick Laughlin • it was passed upon by the council, and, under the rules we have already stated, that should be counted, unless it is shown by the other side that Rawle had no authority to sign.
No. 36. J. M. Ashley, per C. S. Ashley. That we allow upon the testimony of the party. These parties were all in existence and about, and we think that th$ council having passed upon that signature, the burden of proof is upon the plaintiff to show that Mr. Ashley had no authority. These witnesses were all around here, and their testimony could have been taken.
No. 37. John McBride by Wm. Bruns. That we allow, for reason that there is no testimony tending to show that Bruns had no authority. The signature purports to be the signature of the owner per. Bruns.
*554 No. 38. R. M. Streeter per W. M. Bellman. This we reject, because all the evidence seems to have been before us, and shows that Bellman had no authority to sign.
Mrs. A. Brigham by Ira A. Richardson & Son, agents. In this case, Mr. Brigham lived in California. The property had been left in charge of Ira A. Richardson & Son'. Mr. Richardson wrote to him. The whole business had been conducted with W. O. Brigham, the husband. The title was in Mrs. A. E. Brigham. The letter went forward, and was returned with instructions to consent, and that instruction was given by W. O. Brigham, the language being that they might sign his name. It was understood to be authority to sign Mrs. Brigham’s name by Richardson & Son. We think that ought to be counted. The council have passed upon it, and we think the burden of proof was upon the plaintiff to show that Mrs. Brigham did not give her consent. The presumption might fairly be that she did understand it.
The next signature is William Dugdale, C. R. M. Agt. That we allow on the testimony of C. R. Messinger and upon the authority shown. So far as Mr. Perkins is concerned, the presumption would be in favor of the signature being correct. We think there was fair evidence that there was authority to sign, and we count it.
No. 41. E. L. Abell by one of the heirs. “Ownership, last deed to Eliza Abell.” The evidence is that- the other heirs had authorized Mrs. Towers, who was one of the heirs— formerly being Harriet E. Abell — to sign the names, and that the signature was made in this form ; we count that as being the requisite consent of the owners.
John and Alice Buckingham, pel one. Berdan, Agt. Mr. Berdan was authorized to sign for the Buckinghams, if he thought best, John writing him and saying that he directed the matter both for himself and at the request -of the sister. She had become married, and her name was Alice P. Murphy. The title at the time the ordinance was passed being perhaps in John M. Buckingham arid'Alice P. Murphy, but she *555 having received by her heirship, we are of opinion that that ought to be counted as the proper consent of the real owner of the property.
No. 43. Emery Bros, by Gleason & Manning, Agents. That we allow upon the testimony of Mr. Manning, as having sufficient authority to make the signatures.
Mr. Smith — Does the court understand that the Emery consent signature was withdrawn by the same agent, and there is no proof that the third signature was made either by Gleason or Manning, or either of the Emerys, and they had no agents here?
Mr. Brumback — The same agents signed both times.
The Court — I think we came to the conclusion that from the testimony of Maiming, there was sufficient evidence to show that that might have been Mr. Gleason’s hand writing.
Mr. Pratt — The proof was that it was not. He also testified that he knew both of the Emery brothers, and that it was not their signature.
The Court — I will mark and pass it. We had quite a long discussion on that subject, and our final conclusion was to allow it.
No. 44. T. B. Hine. Mr. Hine bought the property, and put it in the name of himself and wife. He never asked her if he could put his property in her name, or whether he might sign for the railroad. The property, however, stands an undivided half in the name of Lavinia R. Hine, and there is no evidence that she ever gave her consent. We count one-half of that property.
No. 45. M. J. Cooney & Co.; ownership, Micháel J. Cooney and James Reid. This property was testified by Mr. Cooney to be held two-thirds in his name, and the other one-third in Mr. Reid; that it was owned and held and used for partnership purposes, and he gave his consent, and supposed at the time that he had authority to give his consent in regard to this partnership property. We are inclined to the opinion *556 that that view is correct, and that it ought to be counted the same as a partnership consent, and as a consent for the whole property, and we have so counted it.
No. 46 is the signature of R. C. Lemmon, who with two others owned a lot. We count one-third of that property for the road, 48.66 feet, the whole lot being 146 feet.
Signature 47,1). W. Miller. This is owned by Daniel W. Miller and wife. We count one-half of that; there is no evidence to show that Frederieka Miller, the wife, had ever consented.
No. 48. F. B. Dodge. Under the testimony that has been offered — Mr. Wither, at the time he bought that property, knew of Mr. Dodge's signature to the consent, and never withdrew it; we think that is sufficient.
No. 49. Fred Eaton. That stands upon the same ground as in the other case; that is, the case immediately preceding, and we count that in favor of the road.
No. 50. Henry Scharf, Executor of Nicholas Scharf. There was a life estate in Mrs. Scharf, an old lady, some eighty years old. Henry Scharf had the remainder. He lived upon the property, and took care of his mother, who was old and feeble, and he signed for the property. We think, under the circumstances, that he ought to be counted in favor of the road. He was in possession of the property, had charge of the property, was the owner of the remainder, the fee was vested in him subject to the life estate of his mother, and we think, under those circumstances, he giving his signature, that the property ought to be counted as the signature of the owner of the property.
No. 51. Locke and Lane, Trustees. Lot 1050 Vistula, 100 feet. “ The trustees have, by the will, the control and management of the property, so far as is necessary to preserve it, for the term of ten years after the the death of .David R. Rocke.'' The power of attorney gives these trustees very full authority over this property, and under that power we think they had authority to do many things, andjwe think fairly had *557 authority to'sign this signature, and that the authority would extend beyond the period of ten years, the same as the exercise of any other power that was properly exercised under it that would pertain to the land, and we therefore have counted this signature in favor of the road.
No. 52. Joseph Keip. This we reject, for the reason that we do not see any sufficient authority.
No. 53. John C. Darst and L. K. Parks. This we allow, upon the authority of Mr. Parks.
No. 54. Mrs. Lillian W. Pope. This we allow on the testimony of Mr. Pope, that- his wife had given him authority.
No. 55. E. M. Kean. Ownership, Edward M Kean. “This signature was made Thomas Kean without any authority from Edward M. Kean. Mr. Thomas Kean had collected the rent and paid the taxes on the property for some years. Mr. Edward M. Kean was not informed that his name was signed to any such consent.” We think that should be rejected.
That, I believe, covers all the signatures that are contested. Our footings of the amounts attached to these signatures proper to be counted make the whole amount 5610.31 feet. One-half the street frontage is 5,302.50 feet, which gives a majority in favor of the consents of 307.81 feet, according to our figuring. Wé therefore hold, on the facts of the case, that at the'time the council passed this ordinance, they had jurisdiction to act upon the question.
The second point that was made was ¡that “the general ordinances of Toledo were disregarded in advertising the application of David Robinson, Jr., Trustee.”
This, we understand, was passed upon in the other case. We have not gone over it, but abide by the decision we made at that time, and hold that the advertisement was not sufficient.
.The third point is, that “the common council exceeded its *558 power.” It is said that the common council had no power to grant this franchise; that it was a new and additional burden upon the street, a new and additional use of the street, not contemplated in the original use of the street, as we understand it, and, unless express power can be shown to have been granted by the legislature, the city council had no power to grant the franchise.
That the city council have the power to grant to the use of the public upon the streets — to a corporation — to build therein or to use the street for the purpose of constructing a railroad, there is no question under the decisions of the Supreme Court of Ohio, as it has been tested. Neally, in our judgment, the only point in the ease is this ; that the using of it for the placing of poles in the street to support the electric wires becomes a new and additional burden, and not one contemplated, and therefore should be given by grant of legislature in the first instance. We are of the opinion on that, as has been stated in a decision that I have before me, that the use of poles for the support of electric wires for the purpose of propelling cars upon this road, is not a new or additional burden; it is only incident to the use of the road for the purpose of street cars to be propelled by electricity, and that in that view of the case, when the city grants to an electric railroad the right to use of the street for railway purposes, the right goes with it to use and erect these poles.
In connection with that comes the question of this new and additional burden. I desire to read from this authority, because it seems to state it so well. I will read from The Atlantic Reporter, vol. 19, page 326. Taggart et al. v. Newport Street Ry. Co.:
“ The fourth ground alleges that if the act of incorporation authorizes the use of electricity for the operation of said street railway, and the erection of the poles as ancilary thereto, it unconstitutional and void because it authorizes the imposition of an additional servitude upon the streets, without providing for any additional compensation to the owners of the fee of said streets. We think it is settled by the greater *559 weight of decisions that a railroad constructed in a street or highway, and operated by steam, in the usual manner, imposes new servitude, and entitles the owner of the fee to an additional compensation, but that a street railway operated by horse power, as such street railways áre ordinarily operated, does not impose any new servitude, and does not entitle the owner of the fee to any additional compensation. (Citing eases.) The distinction is often stated as a distinction between steam and horse railroads, but the distinction properly rests not on any difference in motive power, put in the different .effects produced by them, respectively, on the highways or-streets which they occupy. A steam railroad is held to impose a new servitude, not because it is operated by steam, but because it is so operated as to be incompatible with the use of the street, or in other words, so as practically to exclude the usual modes of use. A steam railroad on a street, so operated as to be consistent with the use of the street in the usual modes, •has been held not to impose a new servitude. (Citing cases.) It is hot the motor, but the kind of occupation, whether practically exclusive or not, is the criterion. (Citing eases.) A steam railroad, as ordinarily operated, it has been said, comes into serious conflict with the usual modes of travel, and is a perpetual embarrassment to them, in greater or less degree, according to the busines's of the railroad is greater or less, oi as the running of the trains is more or less frequent; whereas, the ordinary street railway, instead of adding a new servitude to the street, operates in furtherance of its original uses, and,' instead, of being an embarrassment, relieves the pressure of local business and local travel. (Citing cases.) The only considerable privilege which 'the horse car has over other vehicles is that, being confined to its tracks, it cannot turn aside for other hehicles, while they are forced-to turn aside for it; but this is an incidental matter, insufficient to make the horse railroad a new servitude.
“ The street railway here complained of is operated neither by steam nor horse power, but by electricity. It does no appear however, that it occupies the streets or highways any more exclusively than if it was operated by horse power. The answer avers that ‘ electricity, besides being safe and as easily managed as horse power for the propulsion of street cars, is more quiet, more cleanly, and more convenient than horses, both for residents on the streets used by said cars, and for the-public generally, and also causes much less wear and injury to^ *560 the streets and highways than is occasioned by street cars of which'horses are the motive‘power.’ These averments, the'' case being heard on bill and answer, must be taken as true. Wesee no reason to doubt their truth. It is urged that electricity is a .very.‘dangerous force, and that the court will take judicial notice of its dangerousness. The court will take judicial notice that electricity, developed to some high degree of intensity, is exceedingly dangerous, and even fatally to men or animals, when it is brought in contact with them ; but the court has no judicial knowledge that, as used by the defendant company, it is dangerous. The answer denies that it is dangerous to either life of property. It is also argued that' the cars, moving apparently without the application of external force, alarm and frighten horses. This, so far as it is alleged in the bill, is denied in the answer. We see no reason to suppose that this form of danger is so great'that on account of it the railway should be regarded as an additional servitude. The answer alleges that a great many street railways operated by electricity, in the same manner as the railway of the defendant is operated, are used in various towns and cities in different states, and that many others are in process of construction.
' “ Reference has been made to cases which hold that telegraph or telephone poles and wire erected on streets or highways, constitute an additional servitude, entitling the owners of the fee to additional compensation ; and from -these cases it is urged that the railway here complained of is an additional servitude, by reason of-the poles and wires which communicate' its motive power. There are cases which hold as' stated, and there are cases which hold otherwise. But, assuming that telegraph and telephone poles and wires to create a new servitude, we do not think it follows that the poles and wires erected and used for the service of said street railway likewise create a new servitude. Telegraph and telephone poles and wires are not used to facilitate the use of the streets where they are' erected for travel and transportation, or, if so, very indirectly so , whereas the poles and wires here in question are directly ancillary to the uses of the streets as such, in that they communicate the power by which the street cars are propelled. It’ has been held, for reasons that we consider irrefragible, that a telegraph erected by a railroad company, within its location, for the purposes of its railroad, to increase the safety and ef *561 ficiency thereof, does not constitute an additional servitude, but is only a legitimate development of the easement priginally acquired. (19 Kan. 517.) Our conclusion is that the complainants are not entitled to the relief prayed for, on the ground alleged, and that the bill be dismissed, with costs.”
The road in question is to. be built, as we understand it, through the center line of Huron, street. W.e do not recollect that there is any testimony to show thát it goes any nearer to this lot than the center of the street; nor is there any testimony to show that, in passing through the street, it will be a hindrance to the entrance upon the lot of plaintiff. The obstruction contended for, as we understand it is, that the poles themselves may be an obstruction, but it does not appear that any poles will be set in front of this lot, or that by necessity they must be erected in front of that lot. , If a case should arise where they should attempt to place a pole directly in front of the front gate, or steps, where it might be an obstruction to a safe and proper egress.and ingress to the lot, it might make a case where the party would have a right to redress by way of injunction. The presumption is that the parties, in placing these poles, will place them so as not to interfere with egress or ingress to the respective lots.
We hold that the simple placing of the poles upon the street does not impose an additional burden which would entitle the parties to an injunction.
There still remains one point which we have not discussed, and that is the use of the telephone in plaintiff’s house,and the interference of telephone wires. The testimony, as we remember it, is that the telephone wire is brought to this house from the office by a line which runs through the alley between Huron street and the street next directly south; that it crosses directly over Huron street to a place either upon the plaintiff’s house or an adjoining house, and then is carried to the house of the plaintiff, so that the danger from induction is very slight, the testimony shows. We are very clear in our minds that the testimony does not show that there is any sufficient danger which would *562 call for interference upon the ground of danger from electricity from the telephone wire, or that the railroad wire passing through would be likely to injure anybody who might be at the telephone. It is true that a trolley wire, uninsulated, it it should come in contact with the telephone wire, might throw off a very large amount of electricity, but we see no reason why these wires may not be carried over the streets in such a way that there is no risk and ordinary liability of their coming in contact. Accidents are liable in a great many things we use in our houses daily, as, for instance, artificial and natural gas. There was some evidence tending to show induction of the wires in the neighborhood of Adams street and Huron street, which might effect this telephone, but we are unable to see the force of the conclusions sought to be drawn from that evidence. We think plaintiff's claim should be confined to any injuries she is likely to receive in her house or about her house. If she would have a right to recover for an interference between the wires at Adams and Huron streets, we do not see why every other person in that vicinity should not interfere — we do not think there, is any ground for her to specialty interfere in that regard.
Charles Pratt and Baker, Smith & Baker, for plaintiff.
Orville S. Brumback, Frank H. Hurd and John F. Kumler, for defendants.
Now I believe we have covered the points which have been made. The cause was very ably presented and discussed. We have examined the whole testimony, the citations and these consents in Connection with the evidence, in the manner which I have stated. Of course, there were some points in the statements of the evidence which we have necessarily left out. Our conclusion is that the bill of complaint will have to be dismissed.